WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kristin Fast, | No. CV-20-01448-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| GoDaddy.com LLC, et al., | |
| Defendants. | |

Defendants GoDaddy.com, LLC ("GoDaddy") and Thyagi Lakshmanan have filed a motion for sanctions under Federal Rule of Civil Procedure 37(c)(1) and (e).  Doc. 93. The motion is fully briefed (Docs. 93, 96, 101, 113, 115) and the Court heard oral arguments on December 16, 2021.  For reasons stated below, the Court will grant Defendants' motion in part.[1]

## I.      Background.

In February 2018, while Plaintiff was employed by GoDaddy, she injured her knee in a skiing accident and underwent surgery.  Plaintiff alleges that she was pressured to return to work prematurely following her surgery and, as a result, developed Complex Regional Pain Syndrome ("CRPS"), a debilitating physical condition.  Plaintiff's job later was eliminated, and she alleges that GoDaddy retained male employees with less technical

---

[1] When the Court ordered briefing on Defendants' motion, it directed the parties to request an evidentiary hearing if they thought it necessary.  Doc. 86.  No party requested such a hearing.

skill despite its assertion that she was terminated for lacking technical skill.  Plaintiff asserts claims for sex and disability discrimination and Family Medical Leave Act ("FMLA") retaliation.

The periods for fact and expert discovery in this case have closed.  Defendants claim that Plaintiff knowingly deleted relevant information from her electronic devices and accounts and failed to produce other relevant information in a timely fashion.  They seek sanctions under Rule 37(e) for spoliation of electronically stored information ("ESI") and sanctions under Rule 37(c)(1) for failure to produce relevant information.

## II.     Legal Standards.

### A.     Rule 37(e).

Rule 37(e) was completely revised in 2015 and sets the standards for sanctions arising from the spoliation of ESI.  The Court will apply the rule to Defendants' spoliation claims, taking guidance from the Advisory Committee notes and recent case law.[2]

"Spoliation is the destruction or material alteration of evidence, or the failure to otherwise preserve evidence, for another's use in litigation." *Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011); *see also Pettit v. Smith*, 45 F. Supp. 3d 1099, 1104 (D. Ariz. 2014).  Spoliation arises from the failure to preserve relevant evidence once a duty to preserve has been triggered.  *Surowiec*, 790 F. Supp. 2d at 1005.

Rule 37(e) authorizes a court to sanction a party for losing or destroying ESI it had a duty to preserve.  Thus, if ESI that "should have been preserved in the anticipation or

---

[2] The undersigned judge chaired the Advisory Committee on the Federal Rules of Civil Procedure when the 2015 revision of Rule 37(e) was developed and adopted, and knows of the substantial efforts made to apprise judges and lawyers of the change.  It is therefore quite frustrating that, years after the 2015 revision, some lawyers and judges are still unaware of its significant change to the law of ESI spoliation.  *See, e.g., Holloway v. Cnty. of Orange*, No. SA CV 19-01514-DOC (DFMx), 2021 WL 454239, at *2 (C.D. Cal. Jan. 20, 2021) (granting ESI spoliation sanctions without addressing the requirements of Rule 37(e)); *Mercado Cordova v. Walmart P.R.*, No. 16-2195 (ADC), 2019 WL 3226893, at *4 (D.P.R. July 16, 2019) (same); *Nutrition Distrib. LLC v. PEP Rsch., LLC*, No. 16cv2328-WQH-BLM, 2018 WL 6323082, at *5 (S.D. Cal. Dec. 4, 2018) (ordering adverse inference instructions without addressing the strict requirements of Rule 37(e)(2), and applying the negligence standard that Rule 37(e) specifically rejected).

conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," a court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

This rule establishes three prerequisites to sanctions: the ESI should have been preserved in the anticipation or conduct of litigation, it is lost through a failure to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery. If these requirements are satisfied, the rule authorizes two levels of sanctions. Section (e)(1) permits a court, upon finding prejudice to another party from the loss of ESI, to order measures no greater than necessary to cure the prejudice. Section (e)(2) permits a court to impose more severe sanctions such as adverse inference jury instructions or dismissal, but only if it finds that the spoliating party "acted with the intent to deprive another party of the information's use in the litigation."[3]  Fed. R. Civ. P. 37(e)(2). This rule provides the exclusive source of sanctions for the loss of ESI and forecloses reliance on inherent authority. *See* Rule 37(e) advisory committee note to 2015 amendment (Rule 37(e) "forecloses reliance on inherent authority or state law to determine when certain measures should be used."); *Mannion v. Ameri-Can Freight Sys. Inc.*, No. CV-17-03262-PHX-DWL, 2020 WL 417492, at *5 (D. Ariz. Jan. 27, 2020).

---

[3] Rule 37(e)(2) does not require a finding of prejudice to the party deprived of the information. *See* Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment (finding of prejudice generally not needed under Rule 37(e)(2) because intent to deprive strongly suggests the information would have been favorable to the other party).

1    Finally, the relevant standard of proof for spoliation sanctions is a preponderance of

2    the evidence.  *See Burris v. JPMorgan Chase & Co.*, No. CV-18-03012-PHX-DWL, 2021

3    WL 4627312, at *11 (D. Ariz. Oct. 7, 2021); *Compass Bank v. Morris Cerullo World*

4    *Evangelism*, 104 F. Supp. 3d 1040, 1052-53 (S.D. Cal. 2015).  The Rule 37(e) discussion

5    below will apply this standard.

6        **B.      Rule 37(c)(1).**

7        Rule 37(c)(1) authorizes a court to sanction a party for failing to produce

8    information required by Rule 26(a) or (e).  Rule 26(a) requires a party to make initial

9    disclosures of information it may use to support its claims or defenses, and it not at issue

10   in this case.  Rule 26(e) requires a party to supplement its Rule 26(a) disclosures *and* its

11   responses to interrogatories, requests for production, or requests for admission.  This

12   supplementation must be made "in a timely manner if the party learns that in some material

13   respect the disclosure or response is incomplete or incorrect, and if the additional corrective

14   information has not otherwise been made known to the other parties during the discovery

15   process or in writing[.]"  Fed. R. Civ. P. 26(e).  This "duty to supplement is a continuing

16   duty, and no additional interrogatories by the requesting party are required to obtain the

17   supplemental information – rather the other party has an affirmative duty to amend a prior

18   response if it is materially incomplete or incorrect."  *Inland Waters Pollution Control v.*

19   *Jigawon, Inc.*, No. 2:05-CV-74785, 2008 WL 11357868, at *18 (E.D. Mich. Apr. 8, 2008)

20   (citing 6 James W. Moore et al., *Moore's Federal Practice* § 26.1313).

21       In contrast to Rule 37(d), which applies only when a party fails to respond to a

22   discovery request altogether, *see Fjelstad v. Am. Honda Motor Co., Inc.*, 762 F.2d 1334,

23   1339 (9th Cir. 1985), sanctions are available under Rule 37(c)(1) – for violating Rule 26(e)

24   – when a party provides incomplete, misleading, or false discovery responses and does not

25   complete or correct them by supplement.  *See, e.g.*, *Tisdale v. Fed. Express Corp.*, 415 F.3d

26   516, 525-26 (6th Cir. 2005) (upholding 37(c)(1) sanctions for failure to comply with Rule

27   26(e) when plaintiff "provided false responses and omitted information from his responses"

28   to discovery requests); *Wallace v. Greystar Real Est. Partners*, No. 1:18CV501, 2020 WL

1975405, at *5 (M.D.N.C. Apr. 24, 2020) (holding that "Rule 26(e)'s supplementation mandate also imposed on Defendant GRSSE the responsibility to promptly correct its prior response to Interrogatory 1"); *YYGM S.A. v. Hanger 221 Santa Monica Inc.*, No. CV 14-4637-PA (JPRx), 2015 WL 12660401, at *2 (C.D. Cal. July 24, 2015) (holding sanctions under Rule 37(c)(1) were warranted because, under Rule 26(e), defendants had "a continuing obligation to correct prior 'incomplete or incorrect' responses to discovery"); *Cmty. Ass'n Underwriters of Am., Inc. v. Queensboro Flooring Corp.*, No. 3:10-CV-1559, 2014 WL 3055358, at *7 (M.D. Pa. July 3, 2014) (holding sanctions under 37(c)(1) were warranted when defendants violated Rule 26(e) by falsely stating in response to an interrogatory that no tape recording had been made).

Rule 37(c)(1) provides that a party who violates Rule 26(e) may not use the withheld information at trial unless the failure was substantially justified or harmless.  This is "a 'self-executing, automatic sanction to provide a strong inducement for disclosure of material.'"  *West v. City of Mesa*, 128 F. Supp. 3d 1233, 1247 (D. Ariz. 2015) (quoting *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).  Blocking the use of information trial is, of course, no penalty when the withheld information is unfavorable to the party that failed to disclose it.  But Rule 37(c)(1) also permits a court to order the payment of reasonable expenses caused by the failure, to inform the jury of the party's failure, or to impose "other appropriate sanctions," including a variety of sanctions listed in Rule 37(b)(2)(A)(i)-(vi).  *See* Fed. R. Civ. P. 37(c)(1)(A)-(C).

The Ninth Circuit has not addressed the standard of proof required for Rule 37(c)(1) sanctions, but "exceptions to the preponderance standard are uncommon" in civil litigation.  *WeRide Corp. v. Kun Huang*, 5:18-cv-07233-EJD, 2020 WL 1967209, at *9 (N.D. Cal. Apr. 24, 2020) (considering burden of proof under Rule 37(b)).  The Seventh Circuit, in deciding whether to apply the preponderance standard to sanctions under Rule 37(b), reviewed several Supreme Court cases declining to apply a higher standard of proof in civil cases.  *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776-81 (7th Cir. 2016).  The court emphasized the absence of heightened interests at stake in the underlying suit, which

1  alleged Title VII employment discrimination, concluding that "the case remains a civil suit
2  between private litigants, and what is at stake for [the plaintiff] is the loss of the opportunity
3  to win money damages from his former employer." *Id.* at 781.  The court reasoned that
4  "[t]he preponderance standard appropriately reflects the mutuality of the parties'
5  [discovery] obligations; the clear-and-convincing standard, by contrast, would reflect an
6  unwarranted preference for one party over the other." *Id.* at 779.  District courts in the
7  Seventh Circuit have applied *Ramirez* to Rule 37(c)(1) sanctions.  *See*, *e.g.*, *Sapia v. Bd. of*
8  *Educ. of Chi.*, No. 14-CV-07946, 2020 WL 12139021, at *2 (N.D. Ill. Nov. 30, 2020).

9      The Court finds *Ramirez* helpful.  This too is an employment discrimination case,
10  and the ultimate decision for Plaintiff or for Defendants will be made by a preponderance
11  of the evidence standard.  The Court will apply that standard to its Rule 37(c)(1) sanctions
12  analysis.  The parties have not argued for a higher standard.

13  **III.  Defendants' Motion for Sanctions Under Rule 37(e).**

14      **A.    Plaintiff's Duty to Preserve ESI Arose in May 2018.**

15      Rule 37(e) applies only if Plaintiff had a duty to preserve the ESI at issue – only if
16  the ESI "should have been preserved in the anticipation or conduct of litigation."  Fed. R.
17  Civ. P. Rule 37(e).  Rule 37(e)(1) does not identify a starting date for this duty, but instead
18  looks to the common law.  *See id.*, advisory committee's note to 2015 amendment ("Rule
19  37(e) is based on this common-law duty; it does not attempt to create a new duty to
20  preserve.").  Under the common law, a duty to preserve arises "'when a party knows or
21  should know that certain evidence is relevant to pending or future litigation.'"  *Surowiec*,
22  790 F. Supp. 2d at 1005 (quoting *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 800
23  (N.D. Tex. 2011)).  Defendants argue that Plaintiff's duty arose in May 2018 when she
24  began gathering evidence to use in a potential lawsuit against GoDaddy.  The Court agrees.

25      As early as May 2, 2018, while still employed at GoDaddy,[4] Plaintiff started
26  coordinating with co-worker Lee Mudro to gather instant messages from her work Slack

27  ———————
28  [4] Plaintiff was informed by GoDaddy that her position would be eliminated on April 6, 2018 (Doc. 93 at 2), but she was on paid administrative leave and still technically employed by GoDaddy until May 6, 2018 (*see* Doc. 93-2 at 75).

account for use in potential litigation.  Doc. 93-2 at 92 (May 2, 2018, message from Mudro: "So if GoDaddy deletes ours on slack between what u have saved and I have u will be good to sue").  By May 2, Plaintiff had also put together a document detailing evidence she would use in her case.  *Id.* at 87-90.  By May 4, Plaintiff hired her current lawyer and sent a letter to GoDaddy complaining of discrimination and wrongful termination.  *Id.* at 80 (May 4, 2018: "I retained my attorney today"); *id.* at 39 (May 9, 2018: "His name is Chris Houk"); *id.* at 75-76 (Facebook message to Mudro with text of letter, asking Mudro "You saw my threat last night right?"); *id.* at 87-90, 92; Doc. 101-1 at 6.

Plaintiff confirmed her intent to sue in communications with Mudro on May 7. Doc. 93-2 at 70 (May 7, 2018, message in which Mudro says, "Yep and then sue while on disability," and Plaintiff responds, "Exactly").  By early June, Plaintiff not only anticipated lawsuits against GoDaddy, but also understood that evidence gathering was underway on both sides.  *See* Doc. 93-1 at 80 (June 6, 2018: "So I actually have two lawsuits")); *id.* at 72-73 (June 11, 2018, messages from Plaintiff to Mudro stating, "I learned from Chris, the attorney, to be VERY CAREFUL with GoDaddy" and "everything I type I have to consider that they are reading it"); *id.* at 83 (June 6, 2018, message from Mudro: "I want to post here for u as I am sure once Godaddy knows u r suing them, they will start looking for evidence online by reading your Facebook etc. since I may be your witness I do not want them to know we talk.").

Plaintiff argues that she originally retained attorney Houk only to assist with her severance agreement from GoDaddy and that her duty to preserve did not arise until she retained him to file this lawsuit in July 2020.  Doc. 96 at 9.  But a duty to preserve ESI can arise far in advance of the formal retention of a lawyer or the filing of a lawsuit.  As noted above, the duty arises when litigation is reasonably foreseeable and the party knows or should know the ESI may be relevant to pending or future litigation.  *See Surowiec*, 790 F. Supp. 2d at 1005; *Champions World, LLC v. U.S. Soccer Fed'n*, 276 F.R.D. 577, 582 (N.D. Ill. 2011) (plaintiff's duty to preserve arose approximately two years before filing suit, when the plaintiff investigated possible claims against the defendant); *Barsoum v. N.Y.C.*

*Hous. Auth.*, 202 F.R.D. 396, 400 (S.D.N.Y. 2001) (duty arose 16 months before litigation when plaintiff was receiving assistance of counsel and it was foreseeable that ESI would be relevant to future litigation).  These conditions existed for Plaintiff in early May 2018 when she formed the intent to sue GoDaddy and started collecting evidence for that purpose.  She therefore had a duty to preserve relevant ESI.

**B.     Plaintiff's Alleged Spoliation.**

Defendants allege that Plaintiff failed to take reasonable steps to preserve (1) an undetermined number of Facebook posts, (2) 109 Facebook Messenger messages to and from Ms. Mudro, (3) the contents of her iPhone, (4) the contents of her @cox.net email account, and (5) Telegram Messenger messages between her and Ms. Mudro.  The Court will address each category separately.

**1.     Deleted Facebook Posts.**

Defendants argue that Plaintiff failed to take reasonable steps to preserve "an undetermined number of Facebook posts relating to her alleged treatment by, and termination from, GoDaddy," as well as related likes and comments.  Doc. 93 at 16-17.  Defendants assert that these posts were deleted "sometime between 2018 and 2021."  *Id.* at 5.  Defendants learned of the posts during Plaintiff's August 5, 2021 deposition when she admitted deleting a Facebook post dated April 11, 2018 that she had previously produced to Defendants and which stated that she had been fired by GoDaddy for not being "technical enough."  *Id.* at 4.  Plaintiff testified that she deleted the post, along with others like it, but could not recall if she had done so in 2018 or more recently.  *Id.* (citing Doc. 93-3 at 27).  Plaintiff testified that she was unsure how many posts she had deleted.  Doc. 93-3 at 28 ("Q: Okay.  How many Facebook posts do you think you've deleted since you left GoDaddy?  A: I have no idea.  Q: Five?  A: No idea.  Q: Ten?  A: No idea.  Q: 100?  A: I have no idea.").

Plaintiff now concedes that she either "archived" or "deleted" posts from three of her Facebook accounts.  Doc. 96 at 9-10.[5]  Plaintiff asserts that she "unarchived" and

_____

[5] Plaintiff asserts that she has managed four Facebook accounts: her personal account, a community page set up for CRPS outreach, a business account for her CRPS

- 8 -

produced all posts that had been archived, but does not dispute that her deleted posts are no longer accessible and have not been produced.  *Id.* at 10.  Plaintiff argues that she did not delete anything she considered relevant to this lawsuit and that deletions were not intended to deprive Defendants of the posts.  *Id.*  Plaintiff asserts that she deleted posts from her public foundation's Facebook page "upon finding out that the posted information was not scientifically correct," and "a handful of posts" from her foundation's business account that she "believed were too dark and negative [because she was] afraid that they would drive future employers away."  *Id.*

Plaintiff had a duty to preserve Facebook posts relevant to this suit starting in May 2018.  The Court finds that the deleted posts likely were relevant to this lawsuit.  Plaintiff admitted during her deposition that she was unsure whether she had gone through her social media accounts and turned over everything that might be relevant to her attorney.  Doc. 93-3 at 29-30.  She testified that she was aware of relevant social media information that she may not have turned over to her attorney.  *Id.*  And she testified that she had deleted the April 11, 2018 post – a post with obvious relevance to this lawsuit – along with "anything out there" that was "like that."  *Id.* at 27.

Plaintiff argued at the December 16, 2021 hearing that a fair reading of her deposition shows that the deleted posts were not relevant to this lawsuit, but the above-cited portions of Plaintiff's deposition belie this characterization.  Moreover, in response to being asked, "So when you looked for relevant things, did you look for documents and communications that would relate to your emotional condition and give those to your lawyer?" Plaintiff responded: "That's what I mean by I didn't know that they were relatable, so, no, I probably did not think to do that because I don't think like that." Doc. 93-3 at 30.   When asked, "What about documents that relate to your medical conditions?  Did you go through social media to find all of those and give those over to your lawyer?" Plaintiff replied, "I would not think to do that either."  *Id.*  When asked,

_____

foundation, and a "regular" account for CRPS outreach.  Doc. 96-2 at 4.  Defendants assert that there is a fifth Facebook account associated with Plaintiff entitled "Kristen Fast CRPS Warrior" which has been archived.  Doc. 101 at 8.

"What about documents that relate to your job at GoDaddy and your termination? Did you look for those on social media and give those to your lawyer?" she replied, "I don't think I've done that yet." *Id.*

Plaintiff's arguments that she deleted the posts because they contained incorrect information and she feared they would make it hard for her to get another job are unpersuasive. If Plaintiff was concerned about incorrect information, she could have archived the inaccurate posts. Doing so would have removed them from public view while preserving them for production in this lawsuit. Plaintiff clearly understood Facebook's archive feature – she used it. By choosing instead to delete posts, Plaintiff consciously chose to make them permanently unavailable.

Nor is it plausible that Plaintiff deleted posts because she was concerned about their possible effect on prospective employers. As Defendants note, Plaintiff found a higher-paying job just a few weeks after leaving GoDaddy and she has been continuously employed ever since. Doc. 93 at 4 n.3. Plaintiff also could have addressed any prospective-employer concerns by archiving the posts.

The Court finds by a preponderance of the evidence that the prerequisites to sanctions under Rule 37(e) are satisfied for the deleted Facebook posts. Plaintiff had a duty to preserve the posts after May 2018, she did not take reasonable steps to preserve them, and they cannot be restored or replaced through additional discovery. *See* Fed. R. Civ. P. 37(e). With the prerequisites satisfied, the Court must now determine whether the additional requirements for sanctions under Rule 37(e)(1) and (e)(2) are satisfied.

### a.     Rule 37(e)(1) Prejudice.

Rule 37(e)(1) sanctions are available if Defendants were prejudiced by Plaintiff's deletion of the Facebook posts. "Prejudice exists when spoliation prohibits a party from presenting evidence that is relevant to its underlying case." *Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 236 (D. Minn. 2019). Proving that lost evidence is relevant can be a difficult task, however, because the evidence no longer exists. "To show prejudice resulting from the spoliation," therefore, courts have held that "a party must only come

1  forward with plausible, concrete suggestions as to what [the destroyed] evidence might

2  have been." *TLS Mgmt. & Mktg. Servs. LLC v. Rodriguez-Toledo*, 2017 WL 1155743, *1

3  (D.P.R. 2017) (internal quotations omitted); *see also Paisley Park Enters.*, 330 F.R.D. at

4  236 (finding prejudice where "Plaintiffs are left with an incomplete record of the

5  communications that Defendants had with both each other and third parties.").[6]

6      The evidence shows that Plaintiff's intentional deletion of the Facebook posts

7  deprived Defendants of relevant information.   Plaintiff testified that she deleted an

8  April 11, 2018 post with obvious relevance to this lawsuit, along with "anything out there"

9  that was "like that."  Doc. 93-3 at 27.[7]  She also testified that she did not preserve posts

10  relating to her emotional condition, her medical condition, and her job and termination

11  from GoDaddy, all of which likely would have been relevant in this case.  *Id.* at 30.  The

12  Court finds that Defendants have been prejudiced by Plaintiff's deletion of her Facebook

13  posts.  Sanctions under Rule 37(e)(1) are therefore authorized.

14          **b.     Rule 37(e)(2) Intent.**

15      Rule 37(e)(2) requires a finding that Plaintiff deleted the Facebook posts with "the

16  intent to deprive" Defendants of their use in this litigation.  Fed. R. Civ. P. 37(e)(2).

17  Although direct evidence of such intent is always preferred, a court can find such intent

18  from circumstantial evidence.  *See Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018)

19  (intent required by Rule 37(e)(2) "can be proved indirectly"); *Laub v. Horbaczewski*,

20  No. CV 17-6210-JAK (KS), 2020 WL 9066078, at *6 (C.D. Cal. July 22, 2020) ("Because

21  courts are unable to ascertain precisely what was in a person's head at the time spoliation

22  occurred, they must look to circumstantial evidence to determine intent."); *Paisley Park*

23  *Enters.*, 330 F.R.D. at 236 (circumstantial evidence can be used to prove Rule 37(e)(2)

24  intent); *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017)

25
26      [6] The advisory committee notes to Rule 37(e) make clear that "[t]he rule does not
place a burden of proving or disproving prejudice on one party or the other," but instead
"leaves judges with discretion to determine how best to assess prejudice in particular
27  cases."  Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment.  In this case,
the Court has considered evidence from both sides in reaching its decision.

28      [7] This post was created before Plaintiff's duty to preserve arose, but its primary
significance lies in her admission that she deleted other posts like it.

("[T]he Court may infer an intent to deprive from defendants' actions in this matter."); *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 500 (S.D.N.Y. 2016) (in addressing Rule 37(e)(2) intent, "circumstantial evidence may be accorded equal weight with direct evidence"); S. Gensler & L. Mulligan, Federal Rules of Civil Procedure, Rules and Commentary (2021) at 1164 ("while direct evidence certainly can show a party's intent to deprive, it is not needed.  Rather, a court can find intent to deprive based on circumstantial evidence.").

The Court finds by a preponderance of the evidence that Plaintiff deleted the Facebook posts with an intent to deprive Defendants of their use in this litigation.  This evidence includes (1) the relevancy of the Facebook posts as described above; (2) Plaintiff's clear consciousness that her posts could be useful to Defendants in this case (*see* Doc. 93-1 at 72-73 (June 11, 2018, messages from Plaintiff to Mudro stating, "I learned from Chris, the attorney, to be VERY CAREFUL with GoDaddy" and "everything I type I have to consider that they are reading it"), *id*. at 83 (June 6, 2018, message from Mudro: "I want to post here for u as I am sure once Godaddy knows u r suing them, they will start looking for evidence online by reading your Facebook etc. since I may be your witness I do not want them to know we talk."); (3) Plaintiff's deliberate choice to permanently delete the posts rather than archiving them, as she knew how to do; and (4) the implausibility of her explanation for why she deleted the posts (that they contained incorrect information or could adversely influence prospective employers).

Other courts have found Rule 37(e)(2) intent based on similar evidence.  *See Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730 (N.D. Ala. 2017) (party may be found to have acted with an intent to deprive within the meaning of Rule 37(e)(2) where "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the

spoliator."); *Edwards v. Junior State of Am. Found.*, Civil No. 4:19-CV-140-SDJ, 2021 WL 1600282, *8 (E.D. Tex. Apr. 23, 2021) (finding "brazen failure to take reasonable steps to preserve" ESI where plaintiff opted to permanently delete Facebook account rather than temporarily deactivating it, which would have preserved ESI).

The Court finds that sanctions under Rule 37(e)(2) are authorized for Plaintiff's deletion of the Facebook posts.

### 2.    109 "Unsent" Facebook Messages.

Defendants argue that Plaintiff failed to take reasonable steps to preserve 109 Facebook Messenger messages that she "unsent" to Mudro between September 12 and 23, 2021.  Doc. 93 at 8, 16.  Defendants assert that Plaintiff should have produced all of the messages with Mudro in response to a discovery request in April 2021.  Instead, she disclosed some of the messages only on September 12, 2021, three days before Mudro's deposition. *Id.* at 18-19.  After the deposition, when Mudro produced a copy of the same messages in response to a subpoena, Mudro's copy included 487 messages that Plaintiff had omitted from her production (discussed in more detail below) and 109 instances where Plaintiff "unsent" messages to Mudro, making it impossible for Mudro to produce them. *Id.* at 17.  The unsent messages were visible in Mudro's copy because their time stamps remained but the text was replaced with "this message has been unsent." *Id.* at 8.

Plaintiff argues that sanctions are not appropriate under Rule 37(e) for two reasons. First, she has produced a full copy of her messages with Mudro, including the "unsent" messages, although they were not produced until her response to Defendants' motion for sanctions. *See* Docs. 96 at 4, 96-1 at 69-260.  Second, Plaintiff claims she thought a temporal limitation that applied to other discovery requests also applied to the subpoena served on Mudro, so she unsent messages that were outside of that temporal limitation. Doc. 96 at 7-8.  But Plaintiff's Facebook production shows that she clearly collaborated with Mudro in preparation for and during this case, and Plaintiff does not explain why she did not simply suggest to Mudro that she produce only messages within the relevant time period.

1      Although Plaintiff asserted in her response brief that the Mudro messages have been
2  produced, at least one important unsent message has not.  *See* Doc. 96-1 at 225.  On
3  June 14, 2019, Mudro and Plaintiff were discussing Mudro's upcoming testimony before
4  the EEOC on Plaintiff's charge of discrimination against GoDaddy.  *Id.*  Mudro asked
5  Plaintiff to "[s]end me the evidence we gathered so I can read tonight and ask u specific
6  questions."  *Id.*  Plaintiff's response, sent at 11:57 AM and subsequently unsent by Plaintiff,
7  has never been produced (referred to hereafter as the "11:57 message").  Four minutes after
8  the 11:57 message, Plaintiff sent a follow-up message which reads: "I added you.  Start
9  with the #0 Claims as a guide to walk through the case.  But your area is heaviest at 14-16
10  I think but you are speckled in throughout I just can't remember and I'm on way to
11  doctor[.]"  *Id.* at 224; Doc. 93-3 at 144 (time stamp of 12:01 PM).  It thus appears that the
12  11:57 message contained a summary of the evidence in this case.

13      Following oral arguments, the Court requested supplemental briefing from the
14  parties on when and why the 11:57 message was unsent.  While Plaintiff swore in an
15  affidavit attached to her initial response brief that she unsent the message "years ago in
16  2019" (Doc. 96-2 at 9), her affidavit attached to the supplemental brief now admits that she
17  unsent the message on September 10, 2021, five days before Mudro's deposition in this
18  case.  Doc. 113-1 at 1.

19      Plaintiff's supplemental brief argues that the 11:57 message did not deal with
20  evidence in this case, but instead was a personal message meant for her husband that was
21  erroneously sent to Mudro.  Plaintiff asserts that she did not want Mudro to have the
22  message because it included "deeply personal, family, and spiritual" information.
23  Doc. 113 at 2.  But she admits that she cannot corroborate her assertion that the message
24  was intended for her husband with any record of communications with her husband at about
25  the same time.  *Id.* at 1.  And her argument is inconsistent in other respects.  Her brief
26  asserts that "[b]ecause the message intended for [her husband] was of a personal nature,
27  [Plaintiff] believed she unsent the message to Mudro immediately upon sending it."  Doc.
28  113 at 2; *see also* Doc. 113-1 at 1.  And yet her attached declaration admits that she did not

1    unsend the message until September 10, 2021, shortly before Mudro's deposition.  *Id.*
2    Plaintiff does not explain why, if she realized that she had erroneously sent a highly
3    personal message to Mudro "minutes" after it was sent, she waited two years to unsend it.
4    For these and other reasons explained below, the Court finds Plaintiff's explanation of the
5    11:57 message implausible.

6           The Rule 37(e) prerequisites are satisfied with regard to the 11:57 message.  Plaintiff
7    was under a duty to preserve it for this litigation on September 10, 2021.  By purposefully
8    unsending the message that day, Plaintiff failed to take reasonable steps to preserve it, and
9    it cannot now be restored or replaced through discovery.

10          The prerequisites have not been satisfied for the other 108 unsent messages.  Those
11   messages have now been produced – albeit in a highly untimely fashion – and Rule 37(e)
12   applies only when lost ESI "cannot be restored or replaced through additional discovery[.]"
13   Fed. R. Civ. P. 37(e).  Sanctions under Rule 37(e) therefore are not available for the 108
14   messages, but their untimely production is relevant to other sanctions that may be
15   warranted under Rule 37(c)(1), as discussed below.

16                         a.      **Rule 37(e)(1) Prejudice.**

17          Plaintiff's supplemental brief argues that Plaintiff did not withhold any substantive
18   evidence from Defendants when she unsent the 11:57 message.  Doc. 113 at 2.  In addition
19   to claiming that the message was actually intended for her husband, Plaintiff claims that
20   she did not send any evidence to Mudro until the evening of June 14, 2019.  She produces
21   an email from her to Mudro at 6:09 PM that day (referred to hereafter as the "6:09 email")
22   in which she shared a Google Drive folder with Mudro.  Doc. 113-2 at 246.[8]  Plaintiff
23   claims that the document sent at 6:09 PM was what she and Mudro discussed throughout
24   the Facebook messenger conversation on June 14, 2019.  Doc. 113 at 2-3.  She further
25   argues that the document was a timeline she sent to the EEOC and which has been produced
26   to Defendants in this case.  *Id.*  She supports this by matching citations in her Facebook

27   ─────────────────────
28   [8] This email was a separate form of communication from the Facebook messages being
     discussed in this section – messages which included the unsent 11:57 message.  Plaintiff
     sent the email at 6:09 PM from her address at kristin.I.fast@gmail.com to Mudro's email
     address at leemudro2005@yahoo.com.  *See* Doc. 113-2 at 246.

1    messages to Mudro with sections of the EEOC timeline.  *Id.* at 2-3.  Plaintiff thus asserts

2    that the "evidence" discussed by her and Mudro has been disclosed to Defendants,

3    eliminating any prejudice caused by her unsending of the 11:57 message.  *Id.* at 3.

4         Defendants note in response that they obtained a copy of the EEOC timeline by

5    subpoena to the EEOC, not from Plaintiff's production.  Doc. 115 at 9 n.5.  They also

6    question whether the document discussed by Plaintiff in the 6:09 email was in fact the same

7    document they obtained through their EEOC subpoena because Plaintiff says in the email

8    that the document is 250 pages (Doc. 113-2 at 246), but the EEOC timeline is only 190

9    pages.  Doc. 115 at 9.

10        Plaintiff's arguments about the contents of the 11:57 message are not persuasive.

11   As an initial matter, it is apparent that the Google Doc shared by Plaintiff in the 6:09 email

12   is likely a version – but not the same version – of the EEOC timeline Defendants obtained

13   by subpoena.  Plaintiff's citations to portions of the EEOC timeline do match parts of the

14   discussion with Mudro over Facebook messenger, but the Google Doc shared at 6:09 PM

15   had 250 pages (*see* Doc. 113-2 at 246) and the EEOC timeline has only 190 pages (Doc.

16   113-2 at 3-193).  It is entirely possible that the same document evolved into a shorter

17   version later shared with the EEOC, given that Google Docs is a highly "fluid workspace

18   where authorized users can add to, delete, [and] alter the contents [of a document] at will."

19   Doc. 115-1 at 10.  The longer document has not been produced in this case.

20        Even more importantly, the context of the Facebook message conversation on

21   June 14, 2019 strongly suggests that Plaintiff shared evidence with Mudro at 11:57 AM:

22        **Lee Mudro**
         Send me the evidence we gathered so I can read tonight and ask u specific
23       questions
         *Jun 14, 2019, 10:55 AM*
24
         **Kristin Fast**
25       *This message was unsent.*
         *Jun. 14, 2019, 11:57 AM*
26
         **Kristin Fast**
27       I added you.  Start with the #0 Claims as a guide to walk through the case.
         But your area is heaviest at 14-16 I think but you are speckled in throughout
28       I just can't remember and I'm on way to doctor

[*Jun. 14, 2019, 12:01 PM*][9]

**Lee Mudro**
U do not show anything from me to u that I can see so I don't think they will listen to me.  If u find where our texts r let me know.  U have Dave and Arvin's but none from me.
*Jun. 14, 2019, 5:47 PM*

**Lee Mudro**
I thought there were texts from when u first went to get leave as I remember telling not to trust them by being off radar with DMSA
*Jun. 14, 2019, 5:47 PM*

**Lee Mudro**
Fmla
*Jun. 14, 2019, 5:47 PM*

**Lee Mudro**
I don't have any of them anymore as my texts were deleted when my phone went bad a few months again
*Jun. 14, 2019, 5:47 PM*

**Kristin Fast**
I have them all
*June 14, 2019, 5:48*

**Kristin Fast**
It is in #16
*Jun. 14, 2019, 6:23 PM*

Doc. 96-1 at 224-25.

This exchange shows that the 11:57 message occurred shortly after Mudro asked for the evidence and four minutes before Plaintiff told where to look in the evidence for relevant information, clearly suggesting that Plaintiff sent Mudro the evidence at 11:57 AM.  Later that day, at 5:47 PM, Mudro responded that she could not find messages between her and Plaintiff, suggesting she had reviewed the material Plaintiff sent at 11:57 AM.  Plaintiff immediately responded that "I have them all" and, nine minutes later, sent the 6:09 email with this explanation: "T[h]is the larger file that has EVERYTHING in it."  Doc. 113-2 at 246.  Plaintiff then resumed her Facebook messages telling Mudro where to look in the evidence.  Doc. 96-1 at 225.  This exchange clearly suggests that Plaintiff shared evidence at 11:57 AM, Mudro reviewed it and could not find some relevant

---

[9] Doc. 93-3 at 144 (showing timestamp not visible in Doc. 96-1).

communications, and Plaintiff replied at 6:09 PM by sending a "larger" file of 250 pages that included "EVERYTHING."

Given this context, the Court finds by a preponderance of the evidence that the 11:57 message contained evidence relevant to this case – evidence Plaintiff wanted Mudro to review before her deposition on Plaintiff's EEOC claim against GoDaddy.  Defendants were prejudiced by Plaintiff's destruction of this evidence as required by Rule 37(e)(1).

### b.     Rule 37(e)(2) Intent.

Plaintiff asserts that she "did not intend to hide the content of the unsent message from GoDaddy; rather the content had nothing to do with GoDaddy and was of a personal nature meant for her husband's eyes only." Doc. 113 at 3 (citing Doc. 113-1 ¶ 3). She also asserts that, when she unsent it, she "never meant to destroy the message altogether, only to unsend it to Mudro."  *Id.* at 3-4 (citing Doc. 113-1 ¶ 7-8).  In Plaintiff's most recent declaration, she asserts that while unsending the message she could have taken some additional step using an option called "Remove" to permanently remove the message from Facebook, but refrained from doing so "because [she] had no intention to destroy the message completely." Doc. 113-1 ¶ 7.  Plaintiff nonetheless states that the 11:57 message is inexplicably permanently gone, unlike the other unsent messages that she states were "retrievable." *Id.* at ¶ 8-9.

Defendants contend that Plaintiff's representations about the "Remove" button and how she was able to retrieve other unsent messages are attempts to mislead the Court. Doc. 115 at 7 n.3.  Defendant's forensic expert avows that "[u]nsending a message within Facebook Messenger renders the content of the message irrevocably lost[,]" and "[u]nsent messages cannot be 'retrieved' from Facebook."  Doc. 115-1 at 10 (citing Facebook, *How Do I Remove or Unsend a Message that I've Sent on Facebook Messenger?*, https://www. facebook.com/help/messenger-app/194400311449172) (last visited Jan. 31, 2022)).   It appears Plaintiff was able to produce the other 108 unsent messages because she tendered a copy of the messages that was generated on September 10, 2021, likely before they were unsent.  Doc. 115 at 7 n.3.

The Court is not persuaded by Plaintiff's argument that she did not unsend the message with the intent to deprive Defendants of it.  As an initial matter, her assertions about the "Remove" button and that other unsent messages were retrievable is not credible given the operation of Facebook Messenger as discussed above.  And significantly, Plaintiff now admits that she unsent the message on September 10, 2021, while she was reviewing her Facebook Messenger messages in preparation for their disclosure to Defendants. Doc. 113-1 at 6.  It is not clear why Plaintiff, more than two years after sending the message and on the eve of her production to Defendants, would no longer want Mudro (with whom she discussed many highly personal matters) to have access to the message. The more plausible reason for Plaintiff to unsend the message at this time was that she did not want Defendants to receive it in discovery.

The Court finds by a preponderance of the evidence that Plaintiff unsent the message with the intent to deprive Defendants of its use as required for Rule 37(e)(2) sanctions. *See*, *e.g.*, *Laub*, 2020 WL 9066078, at *6 (when inferring intent, "[r]elevant factors can include, *inter alia*, the timing of the destruction, the method of deletion (e.g., automatic deletion vs. affirmative steps of erasure), [and] selective preservation").  Sanctions under Rule 37(e)(2) are authorized.

### 3.    Stolen iPhone.

Defendants move for sanctions for loss of data on Plaintiff's iPhone 12 Pro, which Plaintiff claims was stolen in September 2021.  Doc. 93 at 16.  Defendants argue that Plaintiff failed to take reasonable steps to preserve the contents of the phone by not backing it up to iCloud.  *Id.* at 12-13.

Plaintiff argues that she did not need to preserve the ESI contained on her iPhone because she preserved communications on the phone for "nearly two years and had produced everything she considered relevant to the lawsuit in discovery before the phone was stolen." Doc. 96 at 11.  Defendant responds that Plaintiff was under an ongoing duty to preserve the evidence until the end of litigation.  Doc. 101 at 8 (citing *Donald J. Trump*

*for President, Inc. v. Boockvar*, No. 2:20-CV-966, 2020 WL 5407748, at *9 (W.D. Pa. Sept. 8, 2020)).

As explained below, the Court finds that Plaintiff had not produced all relevant information from her iPhone before it was stolen. Thus, at the time of the theft, Plaintiff had an ongoing duty to preserve all relevant ESI on the phone, and the Court must determine whether she failed to take reasonable steps to do so.

The advisory committee note to the 2015 amendment of Rule 37(e) provides that the Court should consider a party's sophistication in determining whether the party took reasonable steps to preserve ESI.  *See* Rule 37(e) advisory committee note to 2015 amendment.  Plaintiff argues that she lacks sophistication and "did the best she could." Doc. 96 at 1, 19.  But in other contexts, Plaintiff claims to be very tech-savvy.  *See, e.g.,* Doc. 93-1 at 52 (Plaintiff commenting on her new job: "I run the entire Dev team. I am going to build up the whole department how I want which is awesome.  They are a trash company converting to a tech company and it's perfect for me.  They trust whatever I say and I'm the smartest person technically in the room."); Doc. 101-1 at 13 (Plaintiff email to Dr. Rhodes: "I had run 64 home pages globally, and have a very, very unique talent that is extremely marketable. I can pretty much get a job ANYWHERE in the world making as much as a doctor who went to school for a decade."); *id*. at 22 (Plaintiff email to Auguste Goldman: "I am an expert at Jira/Confluence. I built pricing, cart, creative and many others Jira projects so we didn't get bottlenecked waiting! I'm an expert program manager AND product manager.").  Given these statements by Plaintiff herself, the Court cannot conclude that she lacked the sophistication to back up her phone.

What is more, it appears that Plaintiff did back up her phone at some point during or leading up to this litigation.  She claims that when she activated her replacement phone she "discovered that she had three recordings . . . that she had forgotten about years before."  Doc. 96 at 13.  Plaintiff does not explain why the recordings would have been backed up but not the other contents.

By failing to back up her iPhone, Plaintiff failed to take reasonable steps to preserve the ESI contained on the phone.  *See*, *e.g.*, *Youngevity Int'l v. Smith*, No. 3:16-cv-704-BTM-JLB, 2020 WL 7048687, at *2 (S.D. Cal. July 28, 2020) ("The Relevant Defendants' failure to prevent destruction by backing up their phones' contents or disabling automatic deletion functions was not reasonable because they had control over their text messages and should have taken affirmative steps to prevent their destruction when they became aware of their potential relevance."); *Laub*, 2020 WL 9066078, at *4 (plaintiff failed to take reasonable steps when he "chose not to backup his text messages that were stored on his iPhone"); *Paisley Park Enters.*, 330 F.R.D. at 233 (parties failed to take reasonable steps when they did not use the "relatively simple options to ensure that their text messages were backed up to cloud storage"); *Brewer v. Leprino Foods Co., Inc.*, No. CV-1:16-1091-SMM, 2019 WL 356657, at *10 (E.D. Cal. Jan. 29, 2019) (party failed to take reasonable steps where the was "no effort to back-up or preserve the Galaxy S3 prior to its loss"); *Gaina v. Northridge Hosp. Med. Ctr.*, No. CV 18-00177-DMG (RAOx), 2018 WL 6258895, at *5 (C.D. Cal. Nov. 21, 2018) (similar).

The Court finds that the prerequisites of Rule 37(e) are satisfied with respect to the loss of Plaintiff's iPhone.  She was under a duty to preserve its contents, failed to do so, and the contents are now lost.

### a.  Rule 37(e)(1) Prejudice.

Plaintiff argues that Defendants are not prejudiced by the loss of the ESI contained on her stolen phone because she already produced all the information contained on it that she considered relevant.  But Plaintiff "is not the one who determines what is relevant." *Doe v. Purdue Univ.*, No. 2:17-CV-33-JPK, 2021 WL 2767405, at *8 (N.D. Ind. July 2, 2021) (citing *Jones v. Bremen High Sch. Dist. 228*, No. 08 C 3548, 2010 WL 2106640, at *8 (N.D. Ill. May 25, 2010) ("As a non-lawyer and as an interested party, Jurgens is not qualified to judge whether documents are relevant to the suit.")).  As discussed elsewhere in this order, Plaintiff repeatedly omitted relevant information from her discovery responses.  Further, upon activating her new phone, Plaintiff found clearly relevant ESI –

audio recordings of critical meetings in this case – that she had not produced to Defendants. The Court finds that Plaintiff's failure to take reasonable steps to preserve the contents of her stolen phone prejudiced Defendants. Sanctions under Rule 37(e)(1) are authorized.

### b.      Rule 37(e)(2) Intent.

The Court cannot conclude that Plaintiff failed to back up her phone with an intent to deprive Defendant of its contents in this litigation. Although Defendants initially questioned whether the phone was actually stolen, Plaintiff produced documentation of her insurance claim for loss of the phone and the Court has seen no other evidence suggesting the phone was not stolen. *See* Docs. 93 at 13, 96-3 at 1-17. Assuming the phone was stolen, that act could not have been foreseen or intended by Plaintiff, and neither could its corresponding loss of ESI. The Court therefore cannot find Plaintiff acted with an intent to deprive as required by Rule 37(e)(2).

### 4.      Deactivated Cox.net Email Account.

Defendants claim that Plaintiff failed to take reasonable steps to preserve the contents of her @cox.net email account. Doc. 93 at 16. They argue that it was unreasonable for Plaintiff not to back up the account when she anticipated losing access to it in August 2020. *Id.* at 17. Defendants also note that, contrary to Plaintiff's statements that she lost access to the email account in August 2020 when she disconnected her Cox Communications internet service, Cox's terms of service provide that she retained access to the account for 90 days – until February 2021 – and could have moved the contents to another email provider during that time. *Id.* at 12. Defendants further argue that Plaintiff's claim to have lost all access to the account is false, as demonstrated by an email she produced in this litigation which was forwarded from the @cox.net email address on May 25, 2021. *Id.*; Doc. 93-3 at 227.

Plaintiff claims she disconnected her Cox internet service in August 2020 when she moved to an area in Florida that Cox did not service. Doc. 96 at 11-12. She attempts to explain the May 25, 2021 email by asserting that a "glitch" in her Apple mail app allowed her to retain access to the @cox.net email account after February 2021, but that the "glitch"

1  inexplicably resolved itself after a routine software update in summer 2021, eliminating all

2  access to the @cox.net emails.  *Id.* at 12.  As a result, she no longer has access to the

3  @cox.net account.  *Id.*[10]

4        Plaintiff claims she did not realize she would continue to have access to the email

5  account and could transfer the contents to another email provider for 90 days after her Cox

6  service was disconnected, but she describes no efforts she made to investigate that fact –

7  as her duty to preserve required – before the disconnection.  *Id.*  Nor does she describe any

8  effort she made to download or copy the contents of the @cox.net email account before

9  she had it disconnected.

10        Plaintiff asserts that she did not realize she would lose access to her @cox.net email

11  address after her Cox service was disconnected.  Doc. 96-2 at 7.  Defendants respond by

12  pointing to Cox's terms of service, which state that emails are sent to @cox.net users,

13  before the disconnection of an email address, reminding them to save their emails and

14  providing instructions on how to do so.  Doc. 101 at 8.

15        Whether Plaintiff in fact lost access to her @cox.net email account in November

16  2020 when she disconnected her Cox service, in February 2021 after the 90-day grace

17  period Cox provides in its terms of service, or in the summer of 2021 after a claimed Apple

18  "glitch" was removed by an update, it is clear Plaintiff lost access to the email account after

19  her duty to preserve arose in May 2018.  Plaintiff had a duty to take reasonable steps to

20  preserve the contents of the account and breached that duty when she knowingly ended her

21  account without taking steps to preserve the ESI it contained.  Plaintiff agrees the emails

22  cannot now be restored or replaced.

23        Courts long have recognized that when the deletion of ESI is set to occur, parties

24  have an affirmative duty to step in and prevent its loss.  *See*, *e.g.*, *Surowiec*, 790 F. Supp.

25  2d at 1007.  While Plaintiff claims not to have known that she would lose access to her

26

27        _____
          [10] Plaintiff's brief argues that this software update and attendant loss of access to
28  the @cox.net email account happened "[s]ometime in the summer of 2021[.]"  *Id.* at 12.
     Plaintiff's sworn statement, however, contains no mention of when the update occurred
     and caused her to lose access to the account.  *See* Doc. 96-2 at 7-8.

@cox.net emails, she should have known that the Cox-hosted email account would be deactivated when she terminated her Cox services.

The prerequisites for Rule 37(e) sanctions have been satisfied.  Plaintiff had a duty to preserve the ESI in the email account, she failed to take reasonable steps to preserve it, and the contents of the account cannot now be restored or replaced.

### a.      Rule 37(e)(1) Prejudice.

The Court finds that loss of the @cox.net email account prejudiced Defendants.  The lost ESI likely included communications regarding core events at issue in the case.  The one email preserved from the account addresses Plaintiff's recovery from the surgery that is an essential part of her damages claim.  *See* Doc. 93-3 at 227-28 (email forwarded from Plaintiff's @cox.net email account with re line "Post Op Instructions").  Sanctions under Rule 37(e)(1) are authorized.

### b.      Rule 37(e)(2) Intent.

Defendants have not shown, however, that Plaintiff deactivated her Cox services with the intent to deprive Defendants of the contents of her @cox.net email account as required by Rule 37(e)(2).  Defendants do not dispute that Plaintiff moved to Florida, and they present no evidence that she discontinued her Cox service at that time with an intent to cause the loss of her @cox.net emails.  The Court cannot conclude that her move and disconnection of the service meet the high intent standard of Rule 37(e)(2).

### 5.      Telegram Messages.

At oral argument, Defendants raised another instance of Plaintiff's alleged spoliation, arguing that she deleted messages exchanged between her and Mudro on an application known as Telegram Messenger.  This claim is based on Facebook messages provided for the first time with Plaintiff's response to Defendants' motion for sanctions.  The messages read as follows:

> **Plaintiff**
> Download Telegram Messenger when you have a chance.  I have done stuff I want to tell you.
> *June 22, 2018, 2:13 PM*

- 24 -

**Plaintiff**
Some*
*June 22, 2018, 2:13 PM*

**Plaintiff**
Jeff did [*sic*] this isn't safe anymore
*June 22, 2018, 2:13 PM*

**Lee Mudro**
Ok I am out now I will let u know when I am able to
*June 22, 2018, 2:14 PM*

**Plaintiff**
Ok
*June 22, 2018, 2:26 PM*

**Lee Mudro**
Ok I have telegram messenger downloaded
*June 23, 2018, 3:49 PM*

**Lee Mudro**
Not sure how to use it I put in your cell phone number
*June 23, 2018, 3:54 PM*

Doc. 96-1 at 77.  Plaintiff and Mudro exchanged no further messages on Facebook Messenger for the next five days.  *See id.* at 76-77.

Plaintiff manually deleted the above Facebook messages from her initial production to Defendants and provided no indication that the messages had been removed.  *See* Doc. 93-3 at 101.  Plaintiff also "unsent" her side of the above exchange to prevent Mudro from producing it in response to Defendants' subpoena.  *See* Doc. 93-1 at 55-56. Defendants note that Mudro, in responding to Defendants' subpoena, apparently thought there were Telegram messages to disclose, but, upon opening the Telegram app, saw no messages between her and Plaintiff.  So Mudro took a screenshot of the empty message inbox and produced it to Defendants.  Doc. 115 at 2.  The screenshot showed that Plaintiff had been active on Telegram within the previous hour.  Doc. 113-5 at 6.

Following oral argument, the Court requested supplemental briefing from the parties on whether the Telegram Messenger messages were spoliated.  Plaintiff's supplemental brief asserts that she "cannot remember if she ever communicated with Mudro on Telegram."  Doc. 113 at 4.  Plaintiff argues that "it is likely there never were Telegram messages" between her and Mudro because (1) Mudro's screenshot of the empty message

inbox associated with Plaintiff's Telegram contact contained a note that read "No messages here *yet*," and the same note appears in Plaintiff's Telegram inbox associated with Mudro's contact; and (2) Plaintiff and Mudro "continued extensive conversations – including about deeply personal topics – on Facebook Messenger within days after Mudro stated she downloaded Telegram in June 2018, suggesting that Facebook Messenger remained their method of communication." *Id.*

The Court is not persuaded by Plaintiff's arguments.  Defendants' forensic expert avows that the "No messages here yet" notation does not mean that messages were never sent between Plaintiff and Mudro because the same notation appears when messages have been sent and then deleted.  Doc. 115-1 at 8.  A hallmark of Telegram is that a user can delete sent and received messages for both parties.  *Id.* at 6-7.  The "No messages here yet" note is consistent with a deleted message chain.  *See id*. at 8.  And the fact that Plaintiff and Mudro resumed communications on Facebook Messenger five days after they talked about using Telegram does not mean that they did not also exchange messages on Telegram.  *See* Doc. 96-1 at 76-77.  The evidence shows that Plaintiff and Mudro regularly switched between messaging platforms, including text, email, phone, Slack, and Facebook, rather than using one platform exclusively.

Moreover, the Facebook messages cited above, in combination with the Telegram screenshots provided by Plaintiff and Mudro, strongly suggest that they communicated on Telegram.  To use Telegram, users must choose to connect with each other.  Doc. 115-1 at 3-4.  The screenshots provided by Plaintiff and Mudro show that they each became contacts on the other's Telegram account.  *See* Doc. 113-5 at 6 (Mudro's screenshot showing "Kristin Fast" as a contact); *id.* at 19 (Plaintiff's screenshot showing "Lee Mudro" as a contact).  Further, the conversation between Plaintiff and Mudro on Facebook Messenger ceased without any apparent transmission of the "stuff" that Plaintiff said she wanted to share with Mudro, suggesting they continued their conversation on Telegram.

Additionally, in December 2018, Mudro used Facebook Messenger to ask Plaintiff for an update on her case, using these words: "Call me sometime now that Godaddy is over

u can call. *I don't have that app anymore*[.]" Doc. 96-1 at 259 (emphasis added). Mudro's statement that she did not have "that app anymore" indicates that Mudro no longer had an app they had used to communicate in the past – hence the need for Plaintiff to call. The other "app" could not have been Facebook Messenger because that is how Mudro sent this message. The facts recited above suggest that the "app" likely was Telegram Messenger.

In late June 2018, when Plaintiff suggested to Mudro that they move their communications to Telegram, Plaintiff was under a duty to preserve all relevant ESI, and yet Plaintiff cannot produce any Telegram messages. *See* Doc. 113 at 4. Plaintiff suggests that this could be because Telegram deletes a user's account after six months of inactivity, and argues that "her Telegram account may have been deleted by Telegram due to inactivity in about December 2018." This is unlikely. When a Telegram account is deleted due to six months of inactivity, the account is permanently deleted – the user must make a new account to use Telegram again and old messages and contacts are not retrievable in the new account. Doc. 115-1 at 9.[11]

It is apparent from Plaintiff's own affidavit that her Telegram account was not deleted in this manner. She was able to log into the account in November 2021 using "the same log in credentials" she used "years before." Doc. 113-1 at 3. It is also apparent that Plaintiff's account had not been inactive for six months, and thus subject to Telegram's deletion policy, because Mudro's screenshot, taken on October 2, 2021, showed that Plaintiff had been active within an hour before the screenshot was taken.[12] Doc. 115 at 5.

Further, Plaintiff's attorney asserted at oral argument that Plaintiff uses Telegram to communicate with family members. Doc. 113-6 at 49. And because Telegram is a cloud-based messaging system, Plaintiff's messages should have been available on any

---

[11] Notably, when a user's account is deleted, their contacts retain copies of the messages the user sent to them. Doc. 115-1 at 9. Thus, even if Plaintiff's account had been deleted due to inactivity, that would not explain why Mudro did not retain access to Plaintiff's messages.

[12] Moreover, Plaintiff's own screenshot shows that she had ten unread messages in her inbox in November 2021. Doc. 113-5 at 19. If her account had been deleted, other users presumably would have been unable to send her messages.

1    phone or device she used to log in.  Doc. 115-1 at 3, 8-9.  The only plausible explanation

2    for why neither Plaintiff nor Mudro can produce Telegram messages is that Plaintiff deleted

3    them for both herself and Mudro.  This is especially so given Plaintiff's other attempts to

4    prevent the disclosure of her communications with Mudro.[13]

5         The Court finds by a preponderance of the evidence that Plaintiff communicated

6    with Mudro on Telegram Messenger, that she had a duty to preserve those communications,

7    and that she failed to take reasonable steps to preserve them.  The prerequisites for Rule

8    37(e) sanctions are satisfied.

9                        **a.    Rule 37(e)(1) Prejudice.**

10        Defendants were prejudiced by Plaintiff's failure to preserve Telegram messages.

11   The context of the Facebook conversation preceding Plaintiff and Mudro's Telegram

12   messages shows that the messages were relevant to this case.  Plaintiff asked Mudro to

13   download Telegram on June 22, 2018, so Plaintiff could tell Mudro about some "stuff"

14   because she felt that Facebook was not "safe" anymore.  Doc. 96-1 at 77.  This followed a

15   conversation between Plaintiff and Mudro on June 11, 2018, during which they also

16   discussed whether Facebook was "safe."  Plaintiff told Mudro that she "learned from Chris,

17   the attorney, to be VERY CAREFUL with GoDaddy" and that "everything I type I have to

18   consider that they are reading it[.]"  *Id.* at 94.  In Plaintiff's words, this was "front of mind

19   all the time."  *Id.*  Mudro asked Plaintiff "Do u feel we r safe here," to which Plaintiff

20   responded, "Facebook is putting up quite the fight right now about data, so I think so[.]"

21   *Id.*  "Me too," responded Mudro, "I feel this is the only safe place for us[.]"  *Id.* at 93.

22   These exchanges show that "safe" referred to Plaintiff and Mudro's belief that their

23   conversations on certain platforms would not be discoverable by Defendants.  This accords

24   with other instances where Plaintiff and Mudro's conversations referenced being "safe."

25   *See*, *e.g.*, *id.* at 208-09 (Mudro states that messaging on Facebook "is probably safe" but

26   that "[w]e do not want conversations on text or call it will hurt your case").  When Plaintiff

27

28   _____
     [13] Even if Plaintiff's account had been deleted due to inactivity in December 2018
     – which does not appear to have been the case – Plaintiff was under a duty to step in and
     prevent the deletion or otherwise preserve the messages.

1  told Mudro to switch to Telegram because their Facebook messages were no longer "safe,"

2  then, it appears clear that she wanted to communicate information to Mudro that would not

3  be discovered by Defendants, strongly suggesting that the communications were relevant

4  to this lawsuit.

**b.      Rule 37(e)(2) Intent.**

6          This context and Plaintiff's broader course of conduct regarding the Mudro

7  communications also suggest that she deleted the messages with the intent to deprive

8  Defendants of their use.   Plaintiff and Mudro's Facebook messages are replete with

9  references to their desire to keep certain evidence and communications hidden from

10 Defendant GoDaddy.  *See*, *e.g.*, *id.* at 203-04 (Plaintiff: "[T]he only thing I'm not giving

11 [GoDaddy] is the Richard piece[,] [t]hat's my secret"  Mudro: "Ok they do not know about

12 my texts on my phone and I am not telling them"), 194 (Plaintiff: "So they don't think we

13 are taking [*sic*] right[?]  I have not let on that we are don't don't [*sic*] worry[.]"  Mudro:

14 "They have no idea u and I are talking"), 181 (Mudro: "Do not mention we talked and u

15 know mine save that for court[.]"  Plaintiff: "of course not Lee . . . I would never, I am very

16 smart, you are my secret"), 102 (Plaintiff: "I sent over my 'evidence' last night.  At first I

17 had in a bunch of our texts but he had me remove any evidence of you so I deleted any

18 where there was a connection with you and I[.]"  Mudro: "Ok so is that a surprise for them."

19 Kristin: "It will be.").

20         Plaintiff also tried to conceal the existence of Telegram Messenger communications

21 from Defendants.  She did not disclose them in response to any of Defendant's discovery

22 requests asking for any and all communications.  Doc. 93-3 at 303-04.  And in her tardy

23 production of Facebook communications with Mudro, Plaintiff manually deleted the

24 exchange that referenced her and Mudro's communications on Telegram.  She then unsent

25 her side of the exchange to prevent Mudro from producing the same messages in response

26 to Defendants' subpoena.  Plaintiff did not provide the Facebook messages referencing

27 Telegram until compelled to respond to Defendants' motion for sanctions, and yet by then

28 the Telegram messages were gone.  The most reasonable reading of this course of conduct,

and the finding the Court makes by a preponderance of the evidence, is that Plaintiff deleted her Telegram messages with Mudro to prevent their disclosure to Defendants. Sanctions under Rule 37(e)(2) are authorized.

**IV.    Defendants' Motion for Sanctions Under Rule 37(c)(1).**

Defendants move for sanctions under Rule 37(c)(1) for Plaintiff's failure to produce (1) 487 Facebook Messenger messages between her and Mudro, (2) at least four covertly-made audio recordings of meetings with GoDaddy employees, and (3) emails between Plaintiff and Dr. Donald Rhodes. Plaintiff does not make specific arguments as to why sanctions under Rule 37(c)(1) are not warranted, but instead merely states that Rule 37(e) exclusively governs sanctions for spoliation of ESI. *See* Doc 96 at 15. But Defendants do not argue that these three categories of information have been spoliated, only that Plaintiff failed to produce them in discovery as required by Rule 26(e). As shown above, Rule 37(c)(1) applies to ESI that is not produced as required by Rule 26(e). The Court will construe Plaintiff's various justifications for non-production as arguments regarding harmlessness or substantial justification for purposes of its Rule 37(c)(1) analysis.

**A.    Deleted, Altered, and Fabricated Facebook Messages.**

Defendants argue that Plaintiff produced her Facebook Messenger messages with Mudro without including 487 messages, with undisclosed modifications to the text of several other messages, and with the complete fabrication of one message. Doc. 93 at 7-8, 19. Defendants assert that the modifications were hidden from them by the manner of Plaintiff's production, and that they did not know the production was incomplete until they received a copy of the same messages from Mudro. *Id.* at 6-7, 19.

Plaintiff responds with the significant understatement that her production was "not done perfectly" and argues that she "did the best she could to produce information she believed was relevant." Doc. 96 at 7, 19. Plaintiff describes the process she used:

> [Plaintiff] followed a process in which she converted a PDF download result from Facebook into a Word document so she could manually remove irrelevant messages. . . . She removed messages with Mudro that she considered irrelevant because they were about deeply personal issues . . . At times, as she was reviewing the documents, she had to re-type a message because it disappeared during the download process or she could not simply

take out an irrelevant message. As [Plaintiff] worked from the PDF document to remove irrelevant messages, it became too strenuous for her to continue due to CRPS, so she instead read off of the original PDF and hand-typed the relevant messages into her Word document. Although she attempted to recreate the downloaded message, it was not perfect every time, so mistakes were made.

*Id.* at 8 (citations omitted). Plaintiff asserts that her ability to produce all discoverable information was hindered by the cognitive effects of her CRPS and the medications she takes to cope with it. *Id.* at 14-15. At oral argument, her counsel asserted that the disability caused by Defendants is now being used to undercut her claim against them. Plaintiff argues that she "deleted only a handful of Facebook message[s]—and they were either not relevant to this lawsuit or she preserved them." *Id.* at 19-20.

The Court cannot accept this characterization of Plaintiff's actions. She withheld nearly 500 Facebook messages, not a mere "handful," and the withheld messages were not all irrelevant to her lawsuit. Many of them, while perhaps "deeply personal," were plainly relevant and included information about her pain and the treatment of her CRPS, *see* Doc. 93-1 at 81-82, 91-92, 97-99, her case against GoDaddy and her search for other jobs, *see id.* at 94-95, and her CRPS blog (which is related to her claim that Defendants caused her CRPS and to the amount of her claimed damages), *see id.* at 60-62, 72. Moreover, while Plaintiff complains of the onerousness of complying with her discovery obligations, she simply could have provided the full PDF download to her attorney without converting it to Word and manually removing hundreds of messages. This would be significantly less onerous than the course Plaintiff describes.

Nor can the Court accept Plaintiff's claim that she was cognitively incapacitated by CRPS and therefore hampered in her efforts to meet her discovery obligations. On February 18, 2019, Plaintiff claimed she is "[c]ognitively . . . 95% stronger than most people" and that she "exercise[s her] brain every day." Doc. 93-3 at 153 (Facebook message to Mudro). On June 22, 2021, Plaintiff wrote:

I get up at 8:00am, and I log in online and I work, through the pain, and I lead a large development team. I'm on meetings all day, strategically thinking through projects, roadmaps, strategy, spending millions of dollars in company planning sessions, etc. I'm telling you this for one reason, and

that is to show you that life doesn't stop because you have a disease. Recently, I had a hysterectomy, and I went up against the entire hospital board, all by myself, because it was during COVID and no one was allowed to be there with me. I wanted Ketamine, for 5 days, on a drip, so that the CRPS didn't spread to my abdomen. I was on Fentanyl, Morphine, and Ketamine and I negotiated with surgeons, hospital board administrators and the head pain management doctors. They told me that they had never met anyone like me that was as "functional" as I was while on so many powerful medications. The reason for that is because my brain has remapped itself TO function around the opioids and pain BECAUSE of the opioids and pain because I have never stopped thinking strategically, solving complex problems, and forcing my brain to create new brain cells and neurons.

Doc. 101-1 at 4.

What is more, the modifications Plaintiff made to various messages were clear attempts to conceal information, including Plaintiff's participation in a U.S. trial of CRPS treatment. Two examples illustrate.

First, Plaintiff's initial production of the Mudro messages contained this message, sent by Plaintiff on February 6, 2019, at 11:00 PM: "No I got it in May so not quite a year. I need the booster because when I fell in October I caused a secondary instance of it in my arm in fighting and it's back in my leg[.]" Doc. 93-3 at 157. A message sent by Plaintiff with the same time stamp was unsent and therefore not produced in Mudro's subpoenaed copy of the messages. *See* Doc. 93-1 at 47. But a copy of the same message produced in response to Defendants' motion for sanctions reads as follows, with underlining of text that had been deleted in Plaintiff's initial production:

No I got it in May so not quite a year. I need the booster because when I fell in October I caused a secondary instance of it in my arm in fighting and it's back in my leg, but I got accepted into a US govt trial I start on Monday. No idea how they accepted me! I think they know who I am and are letting me in so I don't hurt their chances of getting approved lol[.]

Doc. 96-1 at 254.

Second, Plaintiff's initial production of the Mudro messages contained the following, sent by Plaintiff on February 18, 2019, at 4:17 PM: "I'm still doing PT. I'm hoping it will give me the final boost I need. Italy definatetly [*sic*] made a HUGE difference. Cognitively I am 95% stronger than most people and I know that is because of Italy and I exercise my brain every day[.]" Doc. 93-3 at 153. The message does not appear

- 32 -

in Mudro's copy because Plaintiff unsent it.  *See* Doc. 93-1 at 39.  The same message in Plaintiff's most recent production reads as follows, with underlining indicating text that was deleted in Plaintiff's initial production:

> I'm still doing PT.  I'm <u>in a trial right now for the same thing I went to Italy for</u> hoping <u>that getting</u> it <u>again</u> will give me the final boost I need.  Italy definately [*sic*] made a HUGE difference.  Cognitively I am 95% stronger than most people and I know that is because of Italy and I exercise my brain every day[.]

Doc. 96-1 at 246.

The fact that Plaintiff is receiving trial treatments for her CRPS is clearly relevant to her claim for CRPS damages in this case.  She had an obligation under Rule 26(e) to produce to Defendants, "in a timely manner," accurate versions of her messages with Mudro rather than the edited versions she produced.  Fed. R. Civ. P. 26(e)(1)(A).  The accurate versions came only after discovery was closed and in response to Defendants' motion for sanctions.  Defendants were unable to use them in preparing for any depositions. Plaintiff has not shown that her failure to produce the accurate messages was substantially justified or harmless.  Sanctions under Rule 37(c)(1) are authorized.

## B.      Audio Recordings.

Defendants argue that Plaintiff failed to produce at least four audio recordings she surreptitiously made of relevant meetings with GoDaddy employees.  Doc. 93 at 19.  On March 3, 2021, Defendants served a discovery request that sought "all . . . recordings . . . relating to the claims, allegations and defenses in this lawsuit."  *Id.* at 3.  Plaintiff responded on April 16, 2021 that she had no recordings related to her claims.  *Id.* at 4.  But shortly before the close of discovery and after all non-expert depositions had been completed, Plaintiff produced three of the four recordings.  *Id.* at 19.  They were recordings of Plaintiff's March 26, 2018 call with Defendant Lakshmanan in which they discussed her medical leave; Plaintiff's April 11, 2018 call with Eva Adams, a human resources employee at GoDaddy, in which Adams told Plaintiff her position with GoDaddy was being eliminated; and Plaintiff's second April 11, 2018 call with Adams in which she and

1    Adams discussed Plaintiff's allegations of FMLA discrimination and complaints about

2    Defendant Lakshmanan.  *Id.* at 9-11.[14]

3         Plaintiff was required to produce all four recordings in response to Defendants'

4    document production request.  Fed. R. Civ. P. 34(b)(2)(B).  Her failure to timely correct

5    the false assertion that there were no recordings violated Rule 26(e).  *See Cmty. Ass'n*

6    *Underwriters of Am., Inc.*, 2014 WL 3055358, at *7 (holding failure to produce tape

7    recording and false certification that no such tape existed in response to an interrogatory

8    supports sanctions under Rules 37(c)(1) and 26(e)).  Plaintiff does not dispute that she had

9    the recordings in her possession, custody, or control and was therefore required to disclose

10   them.  She instead claims she forgot about them.  But it is very difficult to believe that

11   Plaintiff forgot covert recordings she made of pivotal events in this case, particularly when

12   she identified the recordings in a private catalogue of evidence she planned to use in the

13   case and when she produced to Defendants purported written summaries of the very same

14   meetings.  Doc. 93-3 at 205 (Plaintiff's catalogue of evidence, produced by Mudro,

15   documenting May 1, 2018, call with GoDaddy employee Eva Adams and noting "[t]he rest

16   of the conversation was recorded and can be listened to."), 169-70 (Plaintiff's summaries

17   of two March 26, 2018, calls with Defendant Lakshmanan).  In any event, Plaintiff was

18   obligated to make a diligent search for discoverable information, including recordings, and

19   she admits that the recordings were available on her phone.

20        Plaintiff has provided no substantial justification for her failure to produce the

21   recordings and the failure was not harmless.  Defendants were unable to review or use them

22   during any fact deposition in this case, including Plaintiff's.  Her "last-minute tender of

23   [the recordings] does not cure the prejudice."  *Milke v. City of Phoenix*, 497 F. Supp. 3d

24   442, 467 (D. Ariz. 2020).  And Defendants continue to be prejudiced by the failure of

25   Plaintiff to produce the fourth recording she claimed to have made.  It is not clear whether

26   ───────────────
     [14] At oral argument, Plaintiff's counsel suggested that Plaintiff had not withheld the
27   recordings at all because she had never been asked for them.  Doc. 113-6 at 45.  This is not
     correct.  Defendants asked specifically for audio recordings in their Request for Production
28   1, served on March 3, 2021.  *See* Doc. 93-3 at 4.  In her response on April 16, 2021, Plaintiff
     certified that she had no recordings relating to her claims.  *Id.* at 200-01.  Plaintiff
     confirmed this response under oath during her deposition.  Doc. 93 at 9.

1    that recording is lost or Plaintiff has not produced it.  Sanctions under Rule 37(c)(1) are

2    authorized.

3        **C.    Email Communications with Dr. Donald Rhodes.**

4        This last category is one of the most troubling.  Dr. Donald Rhodes is a podiatrist

5    who treated Plaintiff's CRPS in 2019.  Doc. 93 at 13.  He signed a letter on July 7, 2020,

6    opining that Plaintiff's CRPS was caused by swelling that resulted from Plaintiff's leg

7    position while working at Defendants' insistence on February 20-23, 2018.   This

8    contention – that Defendants caused Plaintiff's debilitating CRPS condition – is a key

9    component of this case.  *Id.*

10       Plaintiff did not produce any email communications with Dr. Rhodes in response to

11   Defendants' requests for production prior to Dr. Rhodes's deposition.  *Id.*  Defendants

12   began to suspect during the deposition that Plaintiff had a hand in preparing his letter about

13   her CRPS.  *Id.*  Defendants again requested that Plaintiff produce her communications with

14   Dr. Rhodes, but Plaintiff produced nothing.  *Id.* at 14.  Defendants then subpoenaed Dr.

15   Rhodes for his communications with Plaintiff and he produced several key emails.  *Id.*  In

16   one email, dated July 2, 2020, Plaintiff asked Dr. Rhodes to write a letter saying that her

17   CRPS was caused by working at GoDaddy after surgery.  *Id.*  In another, dated July 7,

18   2020, Plaintiff provided Dr. Rhodes with a draft letter expressing that opinion.  *Id.*

19   Defendants note that Plaintiff's draft letter is nearly identical to the letter Dr. Rhodes

20   signed, which was also dated July 7, 2020.  *Id.*  In short, Plaintiff failed to disclose emails

21   showing that she ghostwrote one of the key medical conclusions in this case.

22       Plaintiff responds only by stating that she "does not remember having written the

23   email or the draft itself" and by claiming that she could not find the emails when she

24   searched for Dr. Rhodes's name or "the exact wording" of the email.  Doc. 96 at 13.  She

25   produces a screenshot of an apparent search of her email account revealing no emails, but

26   she has redacted all search terms in the screenshot, making it impossible to determine what

27   she searched for.  *See* Doc. 96-3 at 29.  Significantly, Plaintiff does not dispute that the

28

1    emails were sent from her email account, does not claim they were sent by someone else,

2    and does not explain why they are not in her possession, custody, or control.[15]

3            Rule 26(e) required Plaintiff to supplement her incomplete response to Defendants'

4    requests for communications with Dr. Rhodes.  Her breach of that obligation was not

5    substantially justified or harmless.  Without the key emails, Defendants could not prepare

6    fully for the deposition of Dr. Rhodes, explore the origin of his critical letter claiming that

7    Plaintiff's CRPS was caused by Defendants, or challenge his claim that he wrote the letter

8    without Plaintiff's assistance.  Sanctions are authorized under Rule 37(c)(1).

9    **V.    Sanctions.**

10           The fact that Rules 37(c)(1) and (e) authorize sanctions does not mean that sanctions

11   must be imposed.  The Court retains discretion to determine what sanctions, if any, are

12   warranted.  As the committee notes to Rule 37(e) observed, "[t]he remedy should fit the

13   wrong, and the severe measures authorized by [Rule 37(e)(2)] should not be used when the

14   information lost was relatively unimportant or lesser measures such as those specified in

15   subdivision (e)(1) would be sufficient to redress the loss."  Fed. R. Civ. P. 37(e), advisory

16   committee notes to 2015 amendment.

17           **A.    Dismissal for Spoliation.**

18           Defendants argue that the most appropriate sanction is dismissal of Plaintiff's suit.

19   Doc. 93 at 20.  They assert that her actions amount to a "pattern of deception and discovery

20   abuse . . . [that makes it] impossible for the district court to conduct a trial with any

21   reasonable assurance that the truth would be available."  *Id.* (quoting *Burris*, 2021 WL

22   4627312, at *16).  Citing the five-part test for case-terminating sanctions in *Leon v. IDX*

23   *Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006), Defendants argue that dismissing Plaintiff's

24   suit would further the public's interest in expeditious resolution of litigation and the Court's

25   interest in managing its docket.  Doc. 93 at 20.  Defendants also argue the risk of prejudice

26

27   _____

28       [15]  Defendants note that Plaintiff recently turned over 115 pages of email
     communications with Dr. Rhodes.  Doc. 101 at 4 n.1.  This is very untimely disclosure, but
     it makes even less clear why she cannot produce the highly relevant July 2 and 7 emails.

1    against them warrants dismissal because Defendants have "been forced to litigate this
2    case . . . based on a partial set of facts that favored Plaintiff." *Id.*[16]

3           Defendants further assert that while the information addressed in their motion has
4    tilted the case in their favor, "these facts are merely the tip of the iceberg" and they will be
5    forced to expend significantly more time and money pursuing additional subpoenas,
6    computer forensic experts, and an evidentiary hearing to present future instances of
7    spoliation if the Court does not dismiss the case. *Id.* Even after taking these additional
8    measures, Defendants argue, there will be no guarantee they "will ever be able to rely on
9    the information Plaintiff produces." *Id.* Defendants concede that there is a public interest
10   in resolving cases on the merits and that interest is not served by dismissal. *Id.* But they
11   argue that less drastic sanctions are not appropriate given "the wide-ranging scope of
12   Plaintiff's spoliation, her clear intent to deprive GoDaddy of evidence in the litigation, and
13   the severe prejudice GoDaddy will continue to suffer if it is forced to continue defending
14   against Plaintiff's claims without ever having full access to the facts." *Id.*

15          Plaintiff argues that dismissal is not appropriate. Doc. 96 at 17. She asserts that she
16   worked diligently to respond to Defendant's discovery requests, "provided relevant
17   information and preserved evidence," and "attempted through multiple channels to retrieve
18   lost information." *Id.* at 19. The documents she did produce, Plaintiff argues "show that
19   she did the best she could to produce information she believed was relevant." *Id.*

20          The Court is not persuaded by Plaintiff's arguments, but dismissal "constitutes the
21   ultimate sanction for spoliation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 593 (4th
22   Cir. 2001). It should be used only when the resulting prejudice is "extraordinary, denying
23   [a party] the ability to adequately defend its case." *Id.* While not dealing with ESI, *Silvestri*
24   illustrates the type of extreme prejudice that justifies terminating a case as a result of

---

25   [16] The five factors cited in *Leon* include "(1) the public's interest in expeditious
     resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice
26   to the party seeking sanctions; (4) the public policy favoring disposition of cases on their
     merits; and (5) the availability of less drastic sanctions." 464 F.3d at 958. *Leon* was a
27   spoliation case, but it was decided before the 2015 amendments to Rule 37(e) and applied
     factors long used in the Ninth Circuit for evaluating case-terminating sanctions. *See, e.g.,*
28   *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987). The factors are not
     specifically tailored to ESI spoliation issues under Rule 37(e).

spoliation.  The plaintiff in *Silvestri* claimed injury as a result of faulty airbags, but the car in which he was injured was repaired before the defendant could examine it and the plaintiff failed to preserve the airbags.  *Id.* at 594.  As a result, the defendant was denied access to "the only evidence from which it could develop its defenses adequately."  *Id.*  The plaintiff's spoliation effectively foreclosed a meaningful defense.

A similar consequence is not present here.  The Court has found Rule 37(e)(2) sanctions authorized for three categories of discovery misconduct: (1) Plaintiff's deletion of an unknown number of Facebook posts, (2) Plaintiff's "unsending" of the 11:57 message that conveyed a summary of her evidence, and (3) Plaintiff's deletion of Telegram Messenger messages between her and Mudro.  While this deprives Defendants of evidence that would be favorable to their case, it does not foreclose a meaningful defense.  The lost evidence primarily appears to be related to Plaintiff's damages claims.  The Court has seen nothing suggesting that it is central to the principal liability issues in this case – whether Defendants violated Title VII by creating a hostile work environment based on sex, violated the FMLA by interfering with Plaintiff's treatment and recovery, or violated the Americans with Disabilities Act by discrimination and a failure to provide reasonable accommodations.  *See* Doc. 25.  And although the spoliation has affected the evidence Defendants have obtained regarding damages, the Court concludes that information obtained through discovery and in response to their motion for sanctions will enable Defendants to prepare and present an effective damages defense, particularly given the other sanctions the Court intends to impose.  The Court therefore finds that the ultimate sanction of case dismissal is not warranted.  *See* Fed. R. Civ. P. 37(e), advisory committee nots to 2015 amendments ("Courts should exercise caution . . . in using the measures specified in (e)(2)").

The Court also finds, however, that Plaintiff's intentional conduct and the prejudice it caused Defendants warrant an adverse inference instruction that will allow the jury to infer that the information intentionally deleted by Plaintiff was unfavorable to her case.  This remedy is warranted by Plaintiff's intentional destruction of ESI and will help

1    alleviate the prejudice to Defendants caused by Plaintiff's actions.   *See Torgersen v.*
2    *Siemens Bldg. Tech., Inc.*, No. 19-CV-4975, 2021 WL 2072151, at *5 (N.D. Ill. May 24,
3    2021).

4    **B.    Dismissal for Redactions.**

5          Defendants argue in their reply brief that dismissal is also warranted for Plaintiff's
6    deletion of messages from the Facebook Messenger conversations with Mudro.  Doc. 101
7    at 4-5.  Plaintiff characterizes her deletions as "redactions for relevance" (Doc. 96 at 8),
8    but as Defendants correctly note, "redaction" is a misnomer – "what Plaintiff did was
9    manufacture a brand new chain of messages that secretly omitted hundreds of messages,
10   without notifying [Defendants]."  Doc. 101 at 4.

11         Defendants rely on two cases: *Evon v. Law Offices of Sidney Mickell*, No. S-09-
12   0760 JAM GGH, 2010 WL 455476 (E.D. Cal. Feb. 3, 2010), and *Islander Group, Inc. v.*
13   *Swimways Corp.*, No. CV 13-00094 LEK-RLP, 2014 WL 12573995 (D. Haw. Jan. 28,
14   2014).  But neither case addresses the sanction of dismissal for improper deletions.

15         The Court concludes that dismissal is not warranted under Rule 37(c)(1) for
16   Plaintiff's undisclosed "redactions."[17]  Surely that conduct is improper and deserving of
17   serious sanctions, which the Court will impose in the form of the monetary penalties
18   discussed below, but it did not foreclose Defendants from preparing an effective defense.
19   All of the redacted materials have now been produced to Defendants.  In addition to the
20   monetary sanctions discussed below, Defendants will be permitted to inform the jury, if
21   they choose to do so, of Plaintiff's withholding of information from her Facebook
22   messages.  *See* Fed. R. Civ. P. 37(c)(1)(B).

23   **C.    Appropriate Sanctions.**

24         Plaintiff's troubling actions in this case are not mere minor oversights, as her
25   counsel suggests.  They are serious violations of Plaintiff's duty to preserve ESI and her
26   obligations under the Federal Rules of Civil procedure.[18]

27   —————————————
        [17] Sanctions are not available under Rule 37(e) because the "redacted" information
28   ultimately was disclosed to Defendants.

        [18] The Court is also concerned about the conduct of Plaintiff's counsel in discovery.

The Court finds that the following sanctions are appropriate in this case:

- As discussed above, the Court will give an adverse inference jury instruction at trial based on (1) Plaintiff's deletion of an unknown number of Facebook posts, (2) Plaintiff's "unsending" of the 11:57 message that conveyed a summary of her evidence, and (3) Plaintiff's deletion of Telegram Messenger messages between her and Mudro.  Fed. R. Civ. P. 37(e)(2).  The parties should discuss the appropriate form of the instruction and include proposals in their submission of jury instructions for the final pretrial conference in this case.[19]

- Defendants will be permitted to inform the jury of Plaintiff's undisclosed "redactions" from her Facebook posts.  Fed. R. Civ. P. 37(c)(1)(B).

- The Court will require Plaintiff to pay some, and perhaps all, of Defendants' attorneys' fees and costs associated with preparing for and litigating the motion for sanctions (Doc. 93), the hearing on December 16, 2021, the supplemental briefing ordered by the Court (including, potentially, Defendants' retention of a forensic evidence expert in connection with the supplemental briefing), and further discovery ordered by the Court in relation to this motion.  The amount of fees and costs will be determined after trial, when the Court can evaluate them in light of the ultimate outcome of this case.

---

He had an affirmative obligation to ensure that his client conducted diligent and thorough searches for discoverable material and that discovery responses were complete and correct when made.  *See* Fed. R. Civ. P. 26(g); *Legault v. Zambarano*, 105 F.3d 24, 28 (1st Cir. 1997) ("The Advisory Committee's Notes to the 1983 amendments to Rule 26 spell out the obvious: a certifying lawyer must make 'a reasonable effort to assure that the client has provided all the information and documents available to him that are responsive to the discovery demand.'"); *Bruner v. City of Phoenix*, No. CV-18-00664-PHX-DJH, 2020 WL 554387, at *8 (D. Ariz. Feb. 4, 2020) ("[I]t is not reasonable for counsel to simply give instructions to his clients and count on them to fulfill their discovery obligations. The Federal Rules of Civil Procedure place an affirmative obligation on an attorney to ensure that their clients' search for responsive documents and information is complete. *See* Fed. R. Civ. P. 26(g)."); *Stevens*, 2019 WL 6499098, at *4 (criticizing "cavalier attitude toward the preservation requirement" where "counsel failed to immediately preserve obviously crucial evidence at a time when the duty to preserve existed and instead allowed the phone to remain in [his client's] possession").

[19] The parties should consider the 2015 advisory committee note to Rule 37(e), *Torgersen*, 2021 WL 2072151, at *5, *Pettit*, 45 F. Supp. 3d at 1114, and other relevant sources in crafting their proposed adverse inference instructions.

- Defendants will be allowed to conduct a forensic review of Plaintiff's electronic devices, if they choose to do so, to determine whether any spoliated or as-yet-unproduced information is recoverable. Plaintiff is hereby ordered to refrain from any further deletion, alteration, or removal of information from any of her electronic devices or accounts prior to this review. If the parties are unable to agree on the scope and timing of this review within two weeks of this order, they shall place a call to the Court to resolve any disagreement.

- Defendants may issue up to four additional third-party subpoenas.

**IT IS ORDERED:**

1.      Defendants' motion for sanctions under Rule 37(c)(1) and (e) is **granted in part and denied in part** as set forth above.

2.      The additional discovery authorized in this order shall be completed by **March 31, 2022**. Dispositive motions are due on **April 29, 2022**. Letters regarding dispositive motions (as required in the Court's Case Management Order) are due **March 31, 2022**.

Dated this 3rd day of February, 2022.

David G. Campbell
Senior United States District Judge